**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**KELLY MCGAURAN,**

                         **Plaintiff,**

            **- against -**

**PECONIC BAY MEDICAL CARE, P.C., and**
**MAUREEN O'CONNOR,**

                       **Defendants.**

**Case No. 16-CV-01740 (GRB)(ARL)**

**DEFENDANTS' RULE 56.1**
**STATEMENT OF UNDISPUTED**
**MATERIAL FACTS**

---

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Rules

of the United States District Court for the Eastern District of New York, and this Court's motion

rules,[1] Defendants, Peconic Bay Medical Care, P.C., (the "Medical Center") (improperly captioned

as Peconic Bay Medical Care) and Maureen O'Connor ("Ms. O'Connor") (collectively,

"Defendants"), set forth the following Statement of Undisputed Material Facts about which they

contend there are no issues to be tried.[2]

---

[1] This Rule 56.1 Statement of Undisputed Facts is submitted in accordance with the Court's motion rules requiring such statement to be submitted with Defendants' pre-motion conference request. Defendants' reserve the right to modify this Statement upon submitting their motion papers.

[2] Each assertion will include a reference to the relevant source when possible. "Pl. Tr. 2017" refers to pages in the transcript of the deposition of Plaintiff Kelly McGauran, taken on March 2, 2017. "Pl. Tr. 2020" refers to pages in the transcript of the deposition of Plaintiff Kelly McGauran, taken on July 29, 2019. "O'Connor Aff." refers to the Affidavit of Maureen O'Connor and "Rauls Aff." Refers to the Affidavit of Monica Rauls. All other references will be to documentary evidence.

## DEFENDANTS' UNDISPUTED FACTS

1.      The Medical Center is a not-for-profit 200-bed community hospital located at 1 Heroes Way, Riverhead, New York 11901. (Rauls Aff.).

2.      The Suffolk County Cancer Services Program ("Cancer Services") is a program operated by the Medical Center and funded by the New York State Department of Health. (Rauls Aff.)

3.      The Medical Center maintains a Non-Discrimination and Anti-Harassment Policy (the "Policy").  The Policy in effect during Plaintiff's employment specifically states:

> It is the policy of this facility that all our employees should be able to enjoy a work environment free from all forms of discrimination and harassment based on race, color, religion, age, sex, national origin, disability, sexual orientation or any other basis protected by federal, state or local laws.  No employee is exempt from this policy. Sexual harassment constitutes discrimination and is illegal under federal, state, and local laws. Harassment/discrimination is a form of employee misconduct that undermines the integrity of the employment relationship, debilitates morale, and therefore, interferes with the work effectiveness of its victims and their co-workers.  The Hospital expects that all relationships among persons in the workplace will be business-like and free of bias, prejudice, harassment and disrespect.
>
> . . .
>
> A manager, who uses implicit or explicit coercive sexual behavior to control, influence, or affect the career, salary, or job of an employee, is engaging in sexual harassment.  Similarly, employees behaving in the manner while working in the Hospital are engaging in sexual harassment.
>
> . . .
>
> Sexual harassment is unacceptable conduct in this institution and will not be condoned or tolerated.  Such conduct may result in legal action (civil or criminal) and will result in disciplinary action, including the possibility of discharge, for employees.

(Documents bates-stamped D000001-D000003).

4.      The Policy also established a procedure for investigating discrimination and

harassment complaints, including sexual harassment.  In relevant part, the Policy provides:

> The Hospital requires the prompt recording of all incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position.  Individuals who believe they have experienced conduct that is contrary to this policy or who have witnessed such conduct should report any complaints to his/her immediate supervisor, Department Head or the Human Resources Department.  Individuals should not feel obligated to report any complaints to their immediate supervisor first before bringing the matter to the attention of one of the other designated representatives identified above.
>
> Upon receipt of a complaint, the Department Head shall immediately notify the Human Resources Department.  A prompt and thorough investigation shall be undertaken by the Human Resources Department to determine the facts pertinent to the complaint.  The investigation may include individual interviews with the parties involved and when necessary with individuals who may have observed the alleged conduct or may have other relevant knowledge.
>
> Confidentiality will be maintained throughout the investigation process to the extent consistent with adequate investigation and appropriate corrective action.  Misconduct constituting harassment, discrimination or retaliation will be dealt with appropriately.  Responsive action may include, for example: training; referral to counseling and/or disciplinary action such as a warning, written reprimand; withholding of a promotion or pay increase; reassignment; temporary suspension without pay; or termination; or such other steps as the Hospital believes appropriate under the circumstances.
>
> The Department of Human Resources will discuss the recommendation with the employee-complainant and recommendations may be sought from the employee-complainant as to how this matter may be concluded.  The purpose of this discussion is to ensure that the employee-complainant is satisfied with the action recommended by the Department of Human Resources. . . .

(Documents bates-stamped D000001-D000003).

5.      The Medical Center maintains a Code of Conduct.  The Code of Conduct in effect during Plaintiff's employment specifically states:

**I. POLICY**

> Peconic Bay Medical Center (PBMC) has implemented a Code of Conduct "to define personal and professional standards of conduct and acceptable behaviors for all people while carrying out assigned responsibilities at PBMC." It is the responsibility of individuals to act in a manner consistent with this code of conduct and to support the code of conduct by holding others accountable to these standards.

**II.  PROCEDURE**

> Issues related to the PBMC Code of Conduct that cannot be resolved between/amongst team members, are to be reported to a supervisor, Human Resources or PBMC's compliance officer. Reported violations of this code of conduct will be addressed through appropriate administrative, departmental and human resources policies related to inappropriate behavior and conduct. PBMC will not tolerate acts of retribution or consequence to any employee who carries out the standards or who reports violations of this Code of Conduct.

(Documents bates-stamped D000004-D000005).

6.      The Medical Center hired Maureen O'Connor as the Assistant Director for Cancer Services on May 1, 2007. (Documents bates-stamped D000234, D000280).

7.      As part of the Medical Center's hiring practices, the Medical Center conducted a background check on Ms. O'Connor, which indicated Ms. O'Connor did not have any criminal history.  (Documents bates-stamped D000254-D000255).

8.      As part of the Medical Center's hiring practices, the Medical Center conducted reference checks with Ms. O'Connor previous employers.  None of Ms. O'Connor employers indicated that she had any complaints against her regarding discrimination or harassment,

4

including sexual harassment. (Documents bates-stamped D000281-D000282, D000342, D000354, D000358).

9.      On April 1, 2008, Ms. O'Connor was promoted to Program Director.  (Document bates-stamped D000239).

10.     The Medical Center regularly conducted verification searches through the New York State Office of the Professions, which consistently revealed that Ms. O'Connor was a licensed master social worker and did not have any disciplinary actions against her.  (Documents bates-stamped D000313-D000314, D000316-D000317, D000319-D000320, D000322-D000323, D000325-D000328, D000330-D000333, D000336-D000337).

11.     The Medical Center also regularly conducted searches through U.S. Department of Health & Humans Services, which confirmed that Ms. O'Connor did have any records regarding fraud. (Documents bates-stamped D000333-D000340, D000373).

**A.      Plaintiff's Employment with the Medical Center**

12.     Plaintiff was hired by the Medical Center on April 25, 2011 as a per diem Outreach Worker for Cancer Services.  (Document bates-stamped D000041).

13.     Plaintiff was interviewed by Ms. O'Connor. (Pl. Tr. 2019 at 49:9-16).

14.     Plaintiff's pay rate was $20.874 per hour.  (Document bates-stamped D000041).

15.     On June 15, 2011, Plaintiff was hired by the Medical Center as a part-time Outreach Worker for Cancer Services.  (Documents bates-stamped D000041, D000038, D000052).

16.     As a part-time employee, Plaintiff was scheduled to work 22.50 hours per week and continued to receive pay at a rate of $20.874 per hour.  (Document bates-stamped D000052).

17.     On July 11, 2011, Plaintiff was required to complete the Medical Center's orientation process, which included a review of the Medical Center's policies.  (Documents bates-stamped D000128-D000129).

18.     On February 6, 2012, Plaintiff's hours were increased from 22.5 hours to 30 hours per week.  (Document bates-stamped D000051).

19.     From February 20, 2012 through April 15, 2012, Plaintiff was on a medical leave of absence.  (Document bates-stamped D000050).

20.     On April 1, 2012, Plaintiff received a raise, increasing her pay rate to $21.71 per hour.  (Documents bates-stamped D000047).

21.     On April 29, 2012, Plaintiff's hours were reduced from 30 hours to 22.5 hours per week due to a reduction in funding.  (Document bates-stamped D000048; O'Connor Aff.).

22.     On July 1, 2013, Plaintiff received a raise, increasing her pay rate to $21.91 per hour.  (Document bates-stamped D000045).

23.     On November 20, 2013, Plaintiff commenced a medical leave of absence. (Document bates-stamped D000046).

24.     On December 1, 2013, Plaintiff was promoted by Ms. O'Connor from a part-time Outreach Worker to a full-time Patient Navigator. (Documents bates-stamped D000044, D000142; Pl. Tr. 2019 at 63:13-21).

25.     As a full-time Patient Navigator, Plaintiff was paid $25.60 per hour and was eligible to receive benefits through the Medical Center. (Document bates-stamped D000044).

26.     In December 2013, Plaintiff began receiving health benefits through the Medical Center.  (Documents bates-stamped D000025-D0000028).

27.     Plaintiff did not share an office with Ms. O'Connor when she commenced employment at Cancer Services.  (Pl. Tr. 2019 at 52:9-22).

28.     Cancer Services later moved its offices to new location. (Pl. Tr. 2019 at 52:23-53:6).

29.     At the new location, Ms. O'Connor had her own office.  (Pl. Tr. 2019 at 53:7-10).

**B.      Plaintiff's Former Employment with Head Start**

30.     In or around July 11, 2011, as part of the onboarding process for Plaintiff as a newly hired part-time employees, Plaintiff submitted an application for employment for the part-time Outreach Worker position.  (Documents bates-stamped D000112-D000115; Pl. Tr. 2019 at 47:9-48:2).

31.     Plaintiff's application identified the Patchogue Head Start Program ("Head Start") as her employer from October 2009 through June 2011.  (Documents bates-stamped D000112-D000115).

32.     During her employment with the Medical Center, Plaintiff enrolled her children at Head Start. (Pl. Tr. 2019 at 79:23-80:5).

33.     On March 12, 2012, the Medical Center provided an employment verification letter to Plaintiff.  (Document bates-stamped D000034).

34.     On September 12, 2012, the Medical Center sent a letter to Head Start verifying Plaintiff's employment with the Medical Center as a part-time Outreach Worker for Cancer Services.  (Document bates-stamped D000033).

**C.      The Fraudulent Letter Submitted to Head Start**

35.     Plaintiff asked Arlene Allen ("Ms. Allen") to write a letter to Head Start regarding her employment and income.  (Pl. Tr. 2017 at 27:24-28:3, 29:18-23).

36.     On April 27, 2015, an employment verification letter was submitted to Head Start (the "April 27, 2015 Letter"). (Letter to Head Start Re: Proof of Income for Kelly McGauran, dated April 27, 2015).

37.     The April 27, 2015 Letter was signed by Ms. Allen. (*Id.*)

38.     The April 27, 2015 Letter indicates that Ms. Allen is the Program Director of Cancer Services.  (*Id.*)

39.     Ms. Allen was employed by the Medical Center as a Patient Navigator in Cancer Services in April 2015. (Rauls Aff.).

40.     The April 27, 2015 Letter provides: "This letter confirms that Kelly McGauran is employed with Cancer Services Program.  This is a per diem position.  She has worked with us since June 16, 2011 and has passed all probationary requirements.  In this current position, Kelly McGauran earns $12 hourly and works between 30-40 hours a week." (Letter to Head Start Re: Proof of Income for Kelly McGauran, dated April 27, 2015).

41.     The April 27, 2015 Letter further states: "Please do not hesitate to contact us if you have any further questions, you can call be at 631-3692770 [sic] ext 104." (*Id.*)

42.     In 2015, Ms. O'Connor was employed as the Program Director of Cancer Services. (Document bates-stamped D000239).

43.     On May 4, 2015, Jessica Ruiz, a Fiscal/Data Manager, ("Ms. Ruiz") received a call from a Family Advocate with Head Start asking to verify Plaintiff's employment with the Medical Center.  (O'Connor Aff.).

44.     The Family Advocate informed Ms. Ruiz that Head Start had received a letter from the Medical Center asserting that Plaintiff was a per diem employee earning $10-12 per hour and the letter was signed by Ms. Allen.  (O'Connor Aff.).

45.     The Medical Center commenced an investigation into the Letter submitted to Head Start.  (O'Connor Aff.).

46.     On May 6, 2015, Ms. Ruiz and Ms. O'Connor searched the Medical Center's computers assigned to Ms. Allen and Plaintiff and documents and files in their offices.  (O'Connor Aff.).

47.     During the search, Ms. O'Connor noticed a paper on Ms. Allen's desk containing her and Plaintiff's names and IP addresses.  (O'Connor Aff.).

48.     On May 6, 2015, Ms. O'Connor contacted the Medical Center's IT Department to help retrieve deleted emails from Ms. Allen and Plaintiff's email accounts. (O'Connor Aff.).

49.     On May 7, 2015, Ms. O'Connor called Head Start to ask about the Letter, but her call was not answered or returned. (O'Connor Aff.).

50.     On May 7, 2015, Ms. Ruiz met with Ms. Allen to retrieve the paper containing Ms. Allen and Plaintiff's names and IP addresses as part of the investigation.  (Document bates-stamped D000402).

51.     Later that day, Plaintiff approached Mr. Ruiz and requested the paper. (Document bates-stamped D000402).

52.     Ms. Ruiz explained that the paper had been given to Ms. O'Connor as part of the Medical Center's investigation.  (Document bates-stamped D000402).

53.     Plaintiff then approached Ms. O'Connor about the paper.  (O'Connor Aff.).

54.     Ms. O'Connor also explained that the paper was being considered in the Medical Center's investigation of the Letter.  (O'Connor Aff.).

55.     In the morning of Friday, May 8, 2015, Human Resources met with Ms. O'Connor and Ms. Ruiz regarding the investigation into the Letter. (O'Connor Aff.).

56.     During the meeting, Human Resources recommended that they search for a copy of the Letter in Ms. Allen's and Plaintiff's emails. (O'Connor Aff.).

57.     On May 26, 2015, the Medical Center sent a letter to Plaintiff informing her of the call from Head Start about the employment verification letter and advising her that "should the letter prove to show fabricated information in regards to your employment with Peconic Bay Medical Center your position will be terminated immediately."   (Documents bates-stamped D000439-D000441; Pl. Tr. 2017 at 32:9-18).

58.     On the same day, the Medical Center sent a similar letter to Ms. Allen. (Documents bates-stamped D0000439-D000441).

**D.     Plaintiff's Sexual Harassment Complaint and The Medical Center's Investigation**

59.     On May 8, 2015, after meeting with Human Resources, Ms. O'Connor asked Plaintiff for an update regarding a particular client. (O'Connor Aff.).

60.     After Plaintiff reported that she had not heard from that client, Ms. O'Connor checked Plaintiff's voicemails. (O'Connor Aff.).

61.     Plaintiff had a voicemail from the client about which Ms. O'Connor had inquired. (O'Connor Aff.).

62.     Ms. O'Connor asked Plaintiff to contact the client before Plaintiff left at 4:00pm. (O'Connor Aff.).

63.     Around 4:00pm, upon leaving, Plaintiff reported to Ms. O'Connor that she would contact the client the next morning.  (O'Connor Aff.).

64.     Ms. O'Connor responded, asking Plaintiff to call the client before she left. (O'Connor Aff.).

65.     Plaintiff refused and left Cancer Services without calling the client.  (O'Connor Aff.).

66.     Around 4:00pm, after Plaintiff left Cancer Services, Plaintiff went to the Human Resources Department to complain about Ms. O'Connor.  (Document bates-stamped D000402).

67.     Plaintiff expressed concerns about Ms. O'Connor going through her emails and checking her voicemails and reported that she had received nasty emails from Ms. O'Connor. (Document bates-stamped D000402).

68.     Plaintiff also reported for the first time that Ms. O'Connor had sexually harassed her. (Document bates-stamped D000402).

69.     On May 9, 2015, Plaintiff did not report to work as scheduled and called in sick. (O'Connor Aff.).

70.     On May 11, 2015, Melissa Truce, Employee & Labor Relations Manager, ("Ms. Truce") met with Plaintiff to discuss the investigation of the Letter.  (Rauls Aff.).

71.     Ms. Truce explained that the Medical Center had a right to search Plaintiff's computer and files, including emails and voicemails, because all of those items are the property of the Medical Center.  (Rauls Aff.).

72.     Ms. Truce also requested additional information from Plaintiff regarding her allegations of sexual harassment against Ms. O'Connor. (Rauls Aff.).

73.     Plaintiff stated that at a fundraiser Ms. O'Connor expressed a desire to kiss her. (Document bates-stamped D000403).

74.     Plaintiff alleged that on one occasion Ms. O'Connor touched her breasts. (Document bates-stamped D000403).

11

75.     Plaintiff alleged that Ms. O'Connor talked about her son's masturbation and sex with her husband.  (Document bates-stamped D000403).

76.     Plaintiff alleged that other employees also felt sexually harassed by Ms. O'Connor, including Ms. Allen, Michele Fredrick, and Jessie Bell.  (Document bates-stamped D000403).

77.     Later that same day, Ms. Truce interviewed Ms. O'Connor regarding Plaintiff's allegations of sexual harassment. (Document bates-stamped D000403).

78.     Ms. O'Connor denied all of the allegations in their entirety.  (Document bates-stamped D000399).

79.     Ms. Truce then met with Plaintiff again to further discuss her complaints of sexual harassment and determine whether she would be comfortable continuing to report to Ms. O'Connor while the investigation was pending.  (Document bates-stamped D000403).

80.     Plaintiff advised Ms. Truce that she had would be comfortable reporting to Ms. O'Connor.  (Document bates-stamped D000403).

81.     Plaintiff acknowledged that she had witnessed Ms. O'Connor address inappropriate conduct in the workplace, including on one occasion when Plaintiff's coworkers were describing other employees as cartoons. (Document bates-stamped D000404).

82.     Ms. Truce and Plaintiff agreed to meet on May 12, 2015, to further discuss Plaintiff's complaints. (Document bates-stamped D000404).

83.     On May 12, 2015, Plaintiff requested a medical leave of absence from work. (Pl. Tr. 2019 at 108:3-6; Rauls Aff.).

84.     On May 13, 2015, the Medical Center sent a letter to Plaintiff confirming her request for a leave of absence commencing on May 12, 2015. (Document bates-stamped D000451).

85.     On May 13, 2015, the Medical Center also provided Plaintiff with information regarding Plaintiff's request for FMLA leave and the necessary documentation. (Document bates-stamped D000451).

86.     Plaintiff submitted medical documentation to the Medical Center indicating that she could not return to work until May 22, 2015.  (Document bates-stamped D000397).

87.     On or around May 21, 2015, Plaintiff requested an extension of her medical leave of absence and submitted a leave of absence request form indicating that she could not return to work for two or three months. (Document bates-stamped D000446; Leave of Absence Request Form, dated May 20, 2015).

88.     On May 28, 2015, Monica Rauls, Vice President, Human Resources ("Ms. Rauls") emailed Plaintiff requesting a follow-up meeting regarding Plaintiff's complaint against Ms. O'Connor.  (Documents bates-stamped D000430-D000431; Email from Ms. Rauls to Plaintiff, dated May 28, 2015).

89.     On June 23, 2015, employees at Cancer Services reported to Ms. O'Connor that Plaintiff publicly posted photos of herself at the beach with the caption "stress free" on her Instagram account.  (Document bates-stamped D000470).

90.     On July 6, 2015, the Medical Center sent a letter to Plaintiff concerning her request for an extension of her leave of absence.  (Document bates-stamped D000405).

91.     The Medical Center also requested that Plaintiff submit additional medical documentation to support an extension of her leave beyond July 20, 2015.

92.     Plaintiff did not submit additional medical documentation as requested.  (Document bates-stamped D000458; Rauls Aff.).

93.     On August 7, 2015, the Medical Center attempted to contact Plaintiff by phone regarding her medical leave of absence.  (Document bates-stamped D000458).

94.     On August 14, 2015, the Medical Center attempted to contact Plaintiff by phone regarding her medical leave of absence.  (Document bates-stamped D000458).

95.     On or around August 21, 2015, the Medical Center sent a letter to Plaintiff requesting that she provide additional medical documentation to support her continued medical leave.  (Document bates-stamped D000458).

96.     Ms. Rauls interviewed Wanda Pagnotta, Clinical Services Coordinator ("Ms. Pagnotta") as part of her investigation of Plaintiff's complaint against Ms. O'Connor.  (Documents bates-stamped D000399-D000401; Rauls Aff.).

97.     Ms. Pagnotta advised Ms. Rauls that she, Plaintiff, and a few other female employees were discussing setting up a fundraiser for Cancer Services and joked about setting up a kissing booth. (Documents bates-stamped D000399-D000401; Rauls Aff.).

98.     Ms. Pagnotta confirmed that Plaintiff was an active participant in the conversation. (Documents bates-stamped D000399-D000401; Rauls Aff.).

99.     Ms. Pagnotta advised that no one made any inappropriate comments to or about Plaintiff except to say that Plaintiff was the "prettiest" of the ladies involved in the conversation. (Documents bates-stamped D000399-D000401; Rauls Aff.).

100.    Ms. Pagnotta confirmed that Ms. O'Connor was not involved in the conversation. (Documents bates-stamped D000399-D000401; Rauls Aff.).

101.    Ms. Pagnotta confirmed that when Ms. O'Connor approached the employees, she told them to stop the conversation and return to work. (Documents bates-stamped D000399-D000401; Rauls Aff.).

102.     Ms. Rauls also interviewed Ms. Ruiz as part of her investigation of Plaintiff's complaint against Ms. O'Connor.  (Documents bates-stamped D000399-D000401; Rauls Aff.).

103.     Ms. Ruiz confirmed that Plaintiff was an active participant in the conversation regarding the kissing booth.  (Documents bates-stamped D000399-D000401; Rauls Aff.).

104.     Ms. Ruiz confirmed that no one made any inappropriate comments to or about Plaintiff.  (Documents bates-stamped D000399-D000401; Rauls Aff.).

105.     Ms. Ruiz confirmed that Ms. O'Connor was not involved in the conversation. (Documents bates-stamped D000399-D000401; Rauls Aff.).

106.     None of the witnesses interviewed by Ms. Rauls corroborated Plaintiff's complaints against Ms. O'Connor. (Documents bates-stamped D000399-D000401).

107.     At the conclusion of the investigation, the Medical Center determined that Plaintiff's complaint against Ms. O'Connor was not substantiated. (*Id*.)

108.     The Medical Center's investigation also noted that the issue involving the fraudulent letter to Head Start would be further investigated upon Plaintiff's return to work.  (*Id*.)

**E.     Plaintiff's Criminal Allegations Against Ms. O'Connor**

109.     On August 24, 2015, Plaintiff reported criminal allegations against Ms. O'Connor to the Riverhead Police Department. (Riverhead Police Department, Incident Report No. 15018789/1, dated August 24, 2015).

110.     On May 16, 2016, the District Attorney's Office moved to dismiss the case against Ms. O'Connor pursuant to New York's Criminal Procedure Law Section 170.40, subsections (g), (h), and (j).  (Transcript of Criminal Hearing, Case No. 2015-CRI-529, dated May 16, 2016).

111.    The District Attorney's Office decided to dismiss the charges outright because Plaintiff lacked credibility and there were inconsistencies in her version of events.  (O'Connor Aff.).

112.    On June 20, 2016, a Certificate of Disposition was issued dismissing the charges against Ms. O'Connor.  (Certification of Disposition, dated June 20, 2016).

**F.      Plaintiff's Application for Worker's Compensation Benefits**

113.    On August 19, 2015, the New York State Workers' Compensation Board denied Plaintiff's request for benefits.  (N.Y.S. Workers' Compensation Board, Subsequent Report of Injury, dated August 19, 2015).

**G.      Plaintiff's Application for Benefits through the Office of Victim Services**

114.    On September 23, 2015, Plaintiff submitted an Application for Compensation to the New York State Office of Victim Services.  (N.Y.S. Office of Victim Services, Application for Compensation, dated September 23, 2015).

115.    On January 19, 2016, the New York State Office of Victim Services denied Plaintiff any monetary award because she "ha[d] not sustained a loss compensable by the OVS." (N.Y.S. Office of Victim Services, Decision, dated January 19, 2016).

116.    On January 9, 2017, the Office of Victim Services issued a decision disallowing Plaintiff's claim.  (N.Y.S. Office of Victim Services, Decision, dated January 9, 2017).

**H.      Plaintiff's Extended Leave and Relocation to Florida**

117.    While on her medical leave of absence from the Medical Center, Plaintiff went on numerous vacations, including to (1) to Columbia to visit family; (2) Las Vegas for a wedding; (3) the Bahamas; and (4) the Cayman Islands with her husband.  (Pl. Tr. 2019 at 148:7-22, 154:17-

155:7; Instagram Posts by kellyjm30 dated October 30, 2015, October 31, 2015, January 18, 2016, and March 2, 2016).

118.    In March 2017, Plaintiff relocated with her family to Florida. (Pl. Tr. 2019 at 8:11-21).

119.    Plaintiff never returned to work at the Medical Center. (Pl. Tr. 2019 at 108:7-23).

120.    Plaintiff never provided the Medical Center with medical documentation indicating that she was cleared to return to work.  (Pl. Tr. 2019 at 19:22-20:9).

Dated:   New York, New York
         February 8, 2022                        /s/ MED
                                         Mary Ellen Donnelly
                                         **BOND SCHOENECK & KING PLLC**
                                         600 Third Avenue, 22nd Floor
                                         New York, New York 10016
                                         (646) 682-0020

                                         *Attorneys for Defendants*

17